UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| HANUMAN, LLC, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| vs. ) | Case No. 2:13-cv-02234-HNJ |
| ) | |
| SUMMIT HOTEL OP, LP, ) | |
| ) | |
| Defendant ) | |

### REVISED MEMORANDUM OPINION

In this diversity action, the defendant proceeds before the court on a Motion for Summary Judgment. (Doc. 19). Plaintiff filed a response (Docs. 21 & 22), and defendant filed a reply (Doc. 23). The parties consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 17). After careful consideration, the court GRANTS the Motion for Summary Judgment.

#### SUMMARY JUDGMENT STANDARD

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(a). Defendants, as the party seeking summary judgment, bear the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S.317, 323 (1986)). The burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper. *Celotex*, 477 U.S. at 323. The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials in the pleadings. Fed. R. Civ. P. 56(e).

At the summary-judgment stage, the court may not weigh the evidence nor determine the truth of the proceedings; rather, the court shall determine only whether a genuine issue exists for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**FACTUAL FINDINGS**

Hanuman owned a Hilton Garden Inn in Birmingham, Alabama. (Doc. 20-1, Hanuman Depo. (Vol. I), at 9).[1] On October 20, 2011, Summit offered to purchase the

---

[1] "Hanuman Depo." refers to the deposition of Hanuman's 30(b)(6) representative, Chiman Patel. In cites to a deposition, the page numbers refer to the CM/ECF pagination of the document rather than the page number of the deposition. All cites to exhibits refer to the CM/ECF page number of the court document containing the exhibit.

Hilton Garden Inn from Hanuman for $8,000,000. (Doc. 20-1 at 38-42 (Letter of Intent)). On November 21, 2011, the parties signed a Purchase Agreement memorializing Summit's contract to purchase the Hilton Garden Inn for $8,625,000.00. (Doc. 20-1 at 44-72 (Purchase Agreement)).

The Purchase Agreement provided for an adjustment to the purchase price based upon implementation of Hilton Worldwide's Product Improvement Plan (PIP) to update the property:

> Seller shall be responsible for ordering the Property Improvement Plan ("PIP") from Hilton Worldwide ("Hilton") and paying the initial PIP fee. The parties shall mutually agree upon the cost of the PIP scope prior to the expiration of the Due Diligence Period and the Purchase Price shall be reduced by the amount that the PIP scope exceeds $1,000,000. Either Purchaser or Seller shall be entitled to terminate this Agreement during the Due Diligence Period if Seller or Purchaser cannot secure a guaranteed, binding contract from a Hilton approved design and build contractor approved solely by Purchaser to perform the PIP work for an amount not to exceed $1,000,000. If the scope of the PIP work exceeds $1,000,000 and this Agreement is not otherwise terminated, the Purchase Price shall be reduced at Closing by the amount the PIP scope exceeds $1,000,000. Upon final completion of all required new ownership PIP items, should the Purchaser's costs specifically associated with new ownership PIP items be less than $1,000,000 the Purchaser warrants that it will reimburse the Seller for the difference in amount in which those total costs are less than $1,000,000.

(Doc. 20-1 at 46)[2] On November 29, 2011, Hilton issued a PIP describing work needed to update the property. (Doc. 20-1 at 74-80 (November 2011 PIP)). On December 27,

---

[2] Hanuman and Summit executed three amendments to the Purchase Agreement; each amendment extended the "Inspection Period" as defined in the Purchase Agreement. (DX 2, Hanuman Depo. (Vol. 2), at Exs. 11, 12 & 13).

2011, Hilton issued a revised PIP representing the "Final PIP" for renovations to the property. (Doc. 20-1 at 82-88).

On February 24, 2012, Hanuman and Summit executed a "Side Letter to Purchase Agreement." The Side Letter Agreement set forth further terms revising the provisions in the afore-cited Paragraph 2.A. of the Purchase Agreement. (Doc. 20-2 at 49-51). The Side Letter Agreement set a "Capped Amount" on the "PIP Work" of $1,000,000 and provided:

> The Seller and Purchaser hereby agree that, in accordance with Section 2.A. of the Agreement, the scope of the PIP Work is equal to, but does not exceed, Capped Amount. Upon final completion of the PIP Work, should Purchaser's actual costs associated with the PIP Work be less than the Capped Amount, Purchaser agrees to reimburse Seller for the difference between the Capped Amount less payment made to Seller for approved Special PIP Items and Purchaser's actual costs associated with the PIP work.

(*Id.* at 49 ("PIP Work Agreement")).

An additional term of the Side Letter Agreement provided that Hanuman would complete and pay for certain items of the PIP Work. (*Id.* at 50 ("Special PIP Items")). Pursuant to this term, Hanuman enjoyed the right to submit, within 60 days of closing, its invoices for completing the Special PIP Items and obtain reimbursement from Summit for those expenditures. (*Id.*). Hanuman did not submit invoices to Summit for the Special PIP expenditures. (Doc. 20-2, Hanuman Depo. (Vol. 2), at 12).

Another term of the Side Letter Agreement provided:

> **Other PIP Items.** Seller's principal, Chiman Patel, in his individual capacity, shall advise, consult and develop pricing on behalf of Purchaser for the Other PIP Items and submit those prices, and installation, including where needed, employment of contractor and/or subcontractors, to Purchaser for the purchase and installation of the Other PIP Items (with all pricing and purchasing subject to final approval by Purchaser and all purchases being made by Purchaser), in order to reduce the total cost of the PIP Work below the Capped Amount.

(Doc. 20-2 at 50). Based upon Patel's recommendation, Summit switched from the company it intended to rely upon to supply furniture, fixtures, operating supplies, and equipment (A1 Fusion Designs) for the Other PIP items and instead contracted with Carver & Associates for those services. (Doc. 20-3, Trowbridge Depo., at 12).

On August 28, 2012, Chris Eng, Summit's Vice President and General Counsel, sent an email to Chiman Patel, the sole member of Hanuman, stating:

> As for the rest of the "Other PIP Items" (items that are not Special PIP items), Summit has engaged Carter [sic] & Associates as the purchasing company for the Other PIP items and we've engaged a contractor to complete the work, which is scheduled to begin November 1st. We will take care of the "Other PIP Items" per the terms of our Agreement. You need not be involved in this aspect of the work and we would ask that you refrain from contacting anyone related to the work**.**

(Doc. 20-3 at 69). Mr. Patel acceded to Eng's request. Doc. 20-2, Hanuman Depo. (Vol. 2), at 33-34).

Summit retained Monolith Hospitality, LLC (Monolith) as its general contractor for the renovations. (Doc. 20-3, Trowbridge Depo., at 32-38). Summit did not consult

with Chiman Patel prior to contracting with Monolith. (Doc. 20-3, Trowbridge Depo., at 12-13; Doc. 20-2, Hanuman Depo. (Vol. 2), at 33). However, Summit based its selection of Monolith as general contractor on a prior positive experience with Monolith on an almost identical renovation. Hilton required the PIP renovations to conform to its "Project Grow - Scenario 2" standards. (Doc. 20-3, Trowbridge Depo., at 18). Monolith successfully completed the first Scenario 2 renovation in the country for Summit at the Hilton Garden Inn in Gwinnett, Georgia. (Doc. 20-3, Trowbridge Depo., at 11).

Summit incurred $1,573,469.02 in costs to complete the PIP renovations to the Hilton Garden Inn. (Doc. 20-3, Trowbridge Depo., at 17, 21-23, 25-28; Doc. 20-4 at 3-4).

Chiman Patel relied upon his extensive experience owning hotels, discussions with other individuals (Alpesh Patel, Robert Staron and Humphreys & Associates), and a compiled spreadsheet, to contend that the cost of Summit's renovations should not have exceeded $600,000. (Doc. 20-1, Hanuman Depo. (Vol. I), at 23, 90-92; Doc. 20-2, Hanuman Depo. (Vol. II), at 23-24; Doc. 21, Chiman Patel Aff.). Chiman Patel sent the PIP for the subject property to Alpesh Patel, the President and Chief Executive Officer of a hotel management company,[3] and asked him to give an opinion on the renovation cost. (Doc. 20-5, Alpesh Patel Depo., at 13). Alpesh Patel testified that the cost

---

[3] Doc. 20-5, Alpesh Patel Depo, at 6.

calculations in the spreadsheet emanated from a three-hour meeting with Chiman Patel, Robert Staron and other contractors (Humphreys & Associates). (*Id.* at 17, 29-31).

After completion of the hotel renovations, Hanuman requested an accounting of the renovation costs. On November 19, 2013, Summit provided Hanuman with contracts, invoices, and other materials reflecting the costs associated with the renovations. (Doc. 20-3 at 56-61; Doc. 20-5 at 66-71; Doc. 21 at 20-25). When Hanuman expressed its dissatisfaction with the details of the information, Summit's Larry Trowbridge reviewed the invoices and associated specific costs with line items in the PIP, and then subsequently created a spreadsheet detailing the $1,573,460.02 in PIP costs. (*See* Doc. 20-3, Trowbridge Depo., at 21-23, 25-28; 63-70; Doc. 20-4 at 3-4, 31-36; Doc. 20-5 at 40-47).

As these events occurred, Hanuman sued Summit for breach of contract and for an accounting, averring that Summit should have remitted $381,156.68, to Hanuman based upon the Side Agreement because the PIP costs should not have exceeded the $1,000,000 Capped Amount.[4]

---

[4] Hanuman calculates this sum based upon its contractors' estimate that Summit could have completed the PIP renovations for $192,361.28, along with the amount for furniture, fixtures, and equipment, $426,481.32, for a total estimated PIP cost of $618,843.36.

**DISCUSSION**

**Summit Deserves Summary Judgment on the Breach of Contract Claim**

In its summary judgement motion, Summit argues there is no genuine issue of material fact on Hanuman's breach-of-contract claim, and it therewith deserves judgment as a matter law because it did not breach its agreements with Hanuman. The Court agrees.

In this diversity action, the Court applies the law of Alabama to the parties' claims and defenses. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). A plaintiff sustains a breach-of-contract claim by proving the following elements: "'(1) that the agreement existed; (2) that the defendant breached the agreement; and (3) that the plaintiff was damaged as a result of the breach.'" *Crestview Memorial Funeral Home, Inc. v. Gilmer*, 79 S.o3d 585, 592 (Ala. 2011) (quoting *Sokol v. Bruno's, Inc.*, 527 So.2d 1245, 1247–48 (Ala.1988)). The parties do not dispute the formation of a contract, and of course there exists a genuine disagreement as to whether Hanuman incurred any damages from an alleged breach. Therefore, the analysis turns on whether there exists a genuine issue of material fact regarding Summit's alleged breached of its pertinent obligations in the agreements at issue.[5]

---

[5] The parties contest whether Hanuman breached its obligations as an aspect of a breach-of-contract claim. Indeed, some cases list this issue as an element for breach-of-contract claims. *See,, e.g., Shaffer v. Regions Fin. Corp.*, 29 So.3d 872, 880 (Ala. 2009) (listing the elements of a breach-of-contract claim as "(1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages"). However, this element does not apply in this case.

"'Breach' consists of the failure without legal excuse to perform any promise forming the whole or part of the contract." *McGinney v. Jackson*, 575 So.2d 1070, 1071 (Ala. 1991) (citation omitted). As an initial matter, Summit did not breach its obligation under paragraph 2 of the Side Agreement to reimburse Hanuman for any difference between the $1,000,000 Capped Amount, less payments made to Hanuman for Special PIP items, and the costs associated with PIP work. As contemplated in that provision, Summit's obligation arose only if its PIP costs summed less than the Capped Amount, a condition precedent which did not occur because it calculated its PIP expenditures at $1,573,460.02. *See Gamble v. Corley, Moncus & Ward, P.C.*, 723 So.2d 627, 631 (Ala. 1988) ("A condition precedent is a fact (other than the lapse of time) that, unless excused, must exist or occur before a duty of immediate performance of a promise arises. . . . Whether a provision in a contract is a condition precedent depends, not upon formal words, but upon the intent of the parties, to be deduced from the instrument as a whole.") (citing

---

Hanuman's alleged nonperformance consists of failing to remit invoices to Summit for the costs it incurred in completing the Special PIP items. This failure to perform under the contract constitutes an immaterial and insubstantial breach that would not excuse Summit's performance. *See Edwards v. Allied Home Mortg. Capital Corp.*, 962 So.2d 194, 207 (Ala. 2007) ("If the defaulting party *materially* breaches its duties, the injured party may repudiate the agreement and not perform prospectively. . . . [Furthermore], [w]hen the parties have exchanged promises of performances, . . . the injured party is not excused from performing his remaining duties if he continues the agreement with knowledge of the default by the breaching party.") (emphasis added) (citations omitted); *Nationwide Mut. Ins. Co. v. Clay*, 525 So.2d 1339, 1343 (Ala. 1987) ("Under general principles of contract law, a *substantial* breach by one party excuses further performance by the other.") (emphasis added); *Birmingham News Co. v. Fitzgerald*, 133 So. 31, 32 (Ala. 1931) ("Every breach of a contract is, of course, inconsistent with the contract; but every breach by one party does not authorize the other to renounce it in toto") (citation omitted).

Therefore, the plaintiff may sustain its breach-of-contract claim even if it failed to submit invoices to Summit. Indeed, this nonperformance inured to Summit's benefit, not Hanuman's.

*Fidelity & Casualty Co. of New York v. DeLoach*, 195 So.2d 789 (1967)). Furthermore, there exists no evidence Summit improperly designated non-PIP costs as PIP costs under the Side Agreement, and therefore, there exists no evidence Summit breached the contract by undertaking such action. *See* Doc. 20-3, Trowbridge Depo. at 21-23, 25-28; 63-70; Doc. 20-4 at 3-4.

Hanuman charges Summit with breaching a purported obligation to "call[] upon (Chiman Patel) to advise, consult, and develop pricing on behalf of Summit and submit those prices and installation . . . to Summit in order to reduce the total cost of the PIP work to [sic] below the $1 million Capped Amount." However, the pertinent language in the Side Agreement did not obligate Summit to perform such an undertaking:

> **Other PIP Items.** Seller's principal, Chiman Patel, in his individual capacity, shall advise, consult and develop pricing on behalf of Purchaser for the Other PIP Items and submit those prices, and installation, including where needed, employment of contractor and/or subcontractors, to Purchaser for the purchase and installation of the Other PIP Items (with all pricing and purchasing subject to final approval by Purchaser and all purchases being made by Purchaser), in order to reduce the total cost of the PIP Work below the Capped Amount.

This provision did not obligate Summit to facilitate Patel's consultancy. At best, it obligated Summit to consider, and either accept or reject, Patel's consult as to contractors, suppliers, and vendors. Thus, if any obligation arose from the quoted terms, the performance fell upon Patel to advise, consult, and develop recommendations, and for Summit to consider, and accept or reject, the recommendations. Indeed, Summit

acknowledged such consult when it accepted Patel's recommendation to secure Carver & Associates for provision of furniture, fixtures, and equipment. The evidence does not evince any failure by Summit to engage its obligations in this regard.

To be sure, Hanuman quotes an email purportedly indicating Summit CEO Chris Eng's directive to Chiman Patel to cease involvement with the PIP renovations and withhold contacting anyone conducting the renovations:

> As for the rest of the "Other PIP Items" (items that are not Special PIP items), Summit has engaged Carter [sic] & Associates as the purchasing company for the Other PIP items and we've engaged a contractor to complete the work, which is scheduled to begin November 1st. We will take care of the "Other PIP Items" per the terms of our Agreement. You need not be involved in this aspect of the work and we would ask that you refrain from contacting anyone related to the work.

The email directing Patel not to contact contractors - who ostensibly were already engaged in conducting PIP renovations – did not prevent Patel from fulfilling its obligation as to the pertinent aspect of the Side Agreement. Eng's invitation that Patel "need not" be involved should not translate into a directive that Patel "should not" be involved. Patel could have still advised and consulted <u>with Summit</u> as to prices, installation, and putative employment of contractors, yet Eng's email clearly provides that Patel should steer clear of communicating <u>with Summit's contractors</u> in doing so, a request which is clearly not prohibited by the agreements. Finally on this point, Eng's statement that Summit "will take care of the "Other PIP items' per the terms of [the] Agreement" referred to Summit's responsibility to cover other PIP costs because the

prior paragraph in the email requested the invoices for the Special PIP items Hanuman completed.

The final breach-of-contract theory lodged by Hanuman contends Summit breached an implied covenant of good faith and fair dealing. As this district has discerned, Alabama law does not sustain a cause of action on this theory:

> Under Alabama law, every contract imposes an obligation of good faith in its performance and enforcement. Ala. Code § 7–1–304 (originally enacted as Ala. Code § 7–1–203). *See also Tanner v. Church's Fried Chicken, Inc.*, 582 So. 2d 449, 451–52 (Ala. 1991). However, the violation of this obligation does not give rise to a cause of action as the statute was intended to be directive, not remedial. *Tanner*, 582 So. 2d at 452 (citing *Chandler v. Hunter*, 340 So. 2d 818, 821 (Ala. Civ. App. 1976)). *See also Government Street Lumber Co., Inc. v. AmSouth Bank, N.A.*, 553 So. 2d 68, 72 (Ala. 1989) ("failure to act in good faith in the performance or enforcement of contracts arising out of Title 7A does not state a claim for relief that may be granted in Alabama, since § 7–1–203 is directive rather than remedial"). Thus, in order to prove a breach of contract on the part of the defendant, a plaintiff must prove that the defendant expressly breached a specific term of the contract. *Tanner*, 582 So. 2d at 452. *Camp v. Alabama Telco Credit Union*, 2013 WL 2106727, at *3 (N.D. Ala. May 13, 2013). Alabama law is clear "that failure to act in good faith in performance or enforcement of contracts . . . does not state a claim for relief that may be granted in Alabama." *Government Street Lumber Co., Inc.*, 553 So. 2d at 72.

*Wiggins v. FDIC*, No.: 2:12-cv-02705-SGC, 2017 WL 588444, * 2 (N.D. Ala. Feb. 14, 2017). To be sure, the law of Alabama does not limit this stance to cases under the Uniform Commercial Code:

> This Court has clearly and specifically held that a duty of good faith in connection with a contract is directive, not remedial, and that therefore an action will not lie for breach of such a duty. *Government Street Lumber Co.*, 553 So.2d 68. The directive nature of the duty is in no way related to the

fact that it is implied rather than expressed. Accordingly, we agree with the trial court's conclusion: "The good faith clause in the present Contract has the same effect and operation as the obligation of good faith *that is implied in all contracts under common law* and in sales contracts under Alabama's UCC."

*Tanner*, 582 So.2d at 452 (emphasis added). Therefore, Hanuman may not sustain its claim under this theory as a matter of law.

Indeed, even if Alabama law provided for such claims, the Court would still grant summary judgment. The putative cause of action provides "'an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract . . . .'" *Lloyd Nolan Found., Inc. v. City of Fairfield Healthcare Auth.*, 837 So.2d 253, 267 (Ala. 2002) (citation omitted). As contemplated, Summit did not "destroy" or "injure" Hanuman's obligation to advise and consult. Eng's email did not direct Patel to cease advising and consulting; rather it advised Patel that he "need not" undertake the "Other PIP items" and asked him not to contact the contractors conducting the renovations.

Summit did not incur more than $1.5 million in Other PIP costs in an effort to injure Hanuman benefits under the contract. Rather, Summit reasonably contracted with a general contractor, Monolith, who had successfully completed the same type of PIP renovations on another property in Gwinnett, Georgia, on a prior occasion. This evidence reveals Summit did not breach any putative covenant of good faith and fair dealing because it chose a contractor it trusted to perform the work correctly.

**Summit Deserves Summary Judgment on the Accounting Claims**

Plaintiff's accounting claim requests a meaningful accounting on a line item basis of all PIP and non-PIP renovation costs so that it may precisely quantify the refund amount it purportedly deserves. A claim for equitable accounting actually encompasses four distinct claims, all of which Alabama recognizes in some form or fashion: an accounting for profits where the defendant is a fiduciary; an accounting where parties engaged complex accounts; an accounting where parties held a mutual account; and an accounting used as a means of discovery for another, putative claim. Joel Eichengrun, *Remedying the Remedy of Accounting*, 60 Ind. L. J. 463, 468 (1985). The Court grants summary judgment on all four theories of equitable accounting.

One Alabama case references the standard for three of the equitable accounting theories:

> Without reference to a discovery, or other relief peculiar to equity, that court will not sustain a bill for accounting unless there are mutual accounts between them; or, if not that, they are so complicated and difficult to adjust that relief at law is not adequate; or fiduciary relations exist between the parties.

*Doss v. Williams*, 32 So.2d 221, 222-23 (Ala. 1947).

As for the latter type of equitable accounting discussed by *Doss*, an accounting for profits where the defendant is a fiduciary, the evidence does not establish that Summit exercised control over any funds as a fiduciary on behalf of Hanuman, and much less

wrongfully used such funds for its own benefit and profit. Therefore, Summit deserves summary judgment on this theory of an equitable accounting.

As for an equitable accounting based upon complex accounts, any putative account between the parties "is not 'complicated' merely because it involves a large number of items." *Id.* (internal citations omitted). "A general averment of complication of accounts [as to render inadequate a legal remedy] is insufficient." *Kirksey Motors, Inc. v. Gen. Acceptance Corp.*, 161 So.2d 475, 477 (Ala. 1964). This form of equitable accounting demands "facts alleged to show that the accounts are so complicated and difficult to adjust that a law court could not easily ascertain and settle the accounts." *Wooten v. Wooten*, 117 So.2d 192, 194 (Ala. 1959). Suffice to say, Hanuman has not sustained its summary judgment burden to demonstrate a genuine issue of material fact on this claim. That is, Hanuman has not demonstrated the existence of any account that is so complicated that equity compels a claim separate from the breach-of-contract claim.

Indeed, the United States Supreme Court has ruled that this type of equitable accounting claim for complex accounts should persist only in the rarest of circumstances:

> The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is . . . the absence of an adequate remedy at law. Consequently, in order to maintain such a suit on a cause of action cognizable at law, as this one is, the plaintiff must be able to show that the "accounts between the parties" are of such a "complicated nature" that only a court of equity can satisfactorily unravel them. In view of the powers given to District Courts by Federal Rule of Civil Procedure 53(b) to appoint masters to assist the jury in those exceptional cases where the legal issues are too complicated for the jury adequately to handle alone,

> the burden of such a showing is considerably increased and it will indeed be a rare case in which it can be met.

*Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962) (footnotes omitted). Because the law of Alabama adopted the applicable Federal Rules of Civil Procedure verbatim, the undersigned fails to discern a diverging conclusion.

The same conclusion derives for an equitable accounting claim based upon mutual accounts. In any event, this claim does not arise based on the facts of this action. "Mutuality is where each of the parties has an account against the other, as where each party has given credit to the other on the faith of indebtedness to him; or each party has a demand or right of action against the other. It is not mutual where it consists of items on one side and payments merely on the other." *Doss*, 32 So.2d at 222. The facts in this case do not portray a "status of mutual accounts existing between" Summit and Hanuman, *Wooten*, 117 So.2d at 194, and thus, Summit deserves summary judgment on this theory.

Finally, several principles regarding an equitable accounting in aid of discovery dooms Hanuman's claim. A "discovery in aid of accounting arises only where there is some duty to discover in equity and good conscience. No such right arises where the matter of accounting grows out of the breach of obligation by complainant, matters which he should have prevented, and which are ascertainable in an action at law." *Meyrovitz v. Watford*, 177 So. 887, 889 (Ala. 1937). "[C]omplainant must aver and prove

> the burden of such a showing is considerably increased and it will indeed be a rare case in which it can be met.

*Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962) (footnotes omitted). Because the law of Alabama adopted the applicable Federal Rules of Civil Procedure verbatim, the undersigned fails to discern a diverging conclusion.

The same conclusion derives for an equitable accounting claim based upon mutual accounts. In any event, this claim does not arise based on the facts of this action. "Mutuality is where each of the parties has an account against the other, as where each party has given credit to the other on the faith of indebtedness to him; or each party has a demand or right of action against the other. It is not mutual where it consists of items on one side and payments merely on the other." *Doss*, 32 So.2d at 222. The facts in this case do not portray a "status of mutual accounts existing between" Summit and Hanuman, *Wooten*, 117 So.2d at 194, and thus, Summit deserves summary judgment on this theory.

Finally, several principles regarding an equitable accounting in aid of discovery dooms Hanuman's claim. A "discovery in aid of accounting arises only where there is some duty to discover in equity and good conscience. No such right arises where the matter of accounting grows out of the breach of obligation by complainant, matters which he should have prevented, and which are ascertainable in an action at law." *Meyrovitz v. Watford*, 177 So. 887, 889 (Ala. 1937). "[C]omplainant must aver and prove

> the burden of such a showing is considerably increased and it will indeed be a rare case in which it can be met.

*Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962) (footnotes omitted). Because the law of Alabama adopted the applicable Federal Rules of Civil Procedure verbatim, the undersigned fails to discern a diverging conclusion.

The same conclusion derives for an equitable accounting claim based upon mutual accounts. In any event, this claim does not arise based on the facts of this action. "Mutuality is where each of the parties has an account against the other, as where each party has given credit to the other on the faith of indebtedness to him; or each party has a demand or right of action against the other. It is not mutual where it consists of items on one side and payments merely on the other." *Doss*, 32 So.2d at 222. The facts in this case do not portray a "status of mutual accounts existing between" Summit and Hanuman, *Wooten*, 117 So.2d at 194, and thus, Summit deserves summary judgment on this theory.

Finally, several principles regarding an equitable accounting in aid of discovery dooms Hanuman's claim. A "discovery in aid of accounting arises only where there is some duty to discover in equity and good conscience. No such right arises where the matter of accounting grows out of the breach of obligation by complainant, matters which he should have prevented, and which are ascertainable in an action at law." *Meyrovitz v. Watford*, 177 So. 887, 889 (Ala. 1937). "[C]omplainant must aver and prove

not only the materiality of the matter of which he would have discovery, but also that it is indispensable to establishment of his cause or defense and that he is unable otherwise to make this proof." *Wooten*, 117 So.2d at 194-95 (citation omitted). "The equity of a bill could not be sustained on ground that it sought discovery, in absence of averments showing confidential relations between complainant and defendant, or that facts essential to support of complainant's claim were peculiarly within defendant's knowledge." *Id.* at 195 (citation and internal quotation marks omitted). Most critically, an equitable accounting for discovery claim cannot survive a showing that "special relief by way of discovery would be obtainable by the statutory system at law devised for that purpose." *George Moulton, Inc. v. Langan*, 233 So.2d 74, 80 (Ala. 1970) (citations omitted); *see also Clay v. River Landing Corp.*, 601 So.2d 919 (Ala. 1992) (the plaintiff was not entitled to an accounting where the defendant provided all requested material regarding the financial management of a condominium).

In this case, Hanuman clearly enjoyed access to a "statutory system at law devised" for the purpose of obtaining the sought-after material, that is, discovery pursuant to the Federal Rules of Civil Procedure. Therefore, Hanuman may not sustain this form of equitable accounting claim. Indeed, the court has reviewed the documents provided to Hanuman, including those memorializing Trowbridge's efforts to associate costs of the renovation work with PIP line items. The court finds the documentation and subsequent explanations by Mr. Trowbridge suffice to accommodate Hanuman's

concerns. Trowbridge marked cost items on the invoices submitted by the general contractor, Monolith, and Carver and Associates, and associated the marked items with the appropriate PIP requirements. Then, he used this information to create a spreadsheet (Ex. 14) summing the associated items to derive the total amount of PIP related costs: $1,573,469.02. The court finds no special circumstances warranting any further accounting by Summit. Therefore, Summit also merits summary judgment on Hanuman's accounting claim.

## CONCLUSION

Based on the foregoing, the court GRANTS the defendant's motion for summary judgment. The court will enter a separate order in conformity with this Memorandum Opinion.

DONE this 2nd day of October, 2017.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE